Joe J. JORDAN, et al.

v.

Arnold T. BERMAN, et al.

No. 89–CV–8172.

United States District Court,
E.D. Pennsylvania.

May 1, 1992.

See also 792 F.Supp. 393.

Sharon K. Wallis, Philadelphia, Pa., for plaintiffs.

Theresa E. Loscalzo, Jacob C. Cohn, Steven R. Waxman, Kathy J. Langley, Philadelphia, Pa., for defendants.

## MEMORANDUM

WALDMAN, District Judge.

## I. BACKGROUND

Plaintiffs brought this action against defendants Arnold T. Berman, Myron J. Berman[1] and the Prothonotary of Philadelphia. Pursuant to 42 U.S.C. § 1983, plaintiffs alleged that they were denied property without due process of law. Plaintiffs also asserted against the Bermans a claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, et. seq., as well as several state law claims.

In response to defendants' motions to dismiss, the court issued an opinion which sets forth in greater detail the factual background to this litigation. See Jordan v. Berman, 758 F.Supp. 269 (E.D.Pa.1991). The court dismissed plaintiffs' civil rights claim against the Prothonotary as well as the state law claims against the Bermans. The dismissal of plaintiffs' fraud claim was without prejudice to replead, which plaintiffs have done. The court denied the Bermans' motion to dismiss the RICO and civil rights claims against them. Presently before the court is a motion by the Bermans for summary judgment on the remaining claims.[2]

## II. LEGAL STANDARD

In considering a motion for summary judgment, the court must consider whether the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact, and whether the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986); Arnold Pontiac–GMC, Inc. v. General Motors Corporation, 786 F.2d 564, 568 (3d Cir. 1986); Only facts that may affect the outcome of a case under applicable law are

"material." Anderson, 477 U.S. at 248, 106 S.Ct. at 2510.

All reasonable inferences from the record must be drawn in favor of the non-movant. Anderson, 477 U.S. at 255, 106 S.Ct. at 2513. Although the movant has the initial burden of demonstrating an absence of genuine issues of material fact, the non-movant must then establish the existence of each element on which it bears the burden of proof. J.F. Feeser, Inc. v. Serv–A–Portion, 909 F.2d 1524, 1531 (3d Cir.1990), cert. denied, —— U.S. ——, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)).

## III. FACTS

The pertinent facts in the light most favorable to plaintiffs are as follow. On July 8, 1981, plaintiff Jordan executed a lease agreement (hereinafter "the Lease") with Arnold Berman, trading as H.P. Realty, Inc. ("H.P."). Jordan executed the Lease on behalf of Joe J. Jordan, FAIA, Inc. for the fifth floor of a building located at 1920 Chestnut Street in Philadelphia. Plaintiffs organized their architectural firm, Jordan, Mitchell, Inc. ("Jordan, Mitchell") a few months after the Lease was executed and operated it from the leased premises. The Lease was to expire at the end of July 1986 but would automatically renew if neither party gave written notice of termination ninety days before expiration.

Jordan, Mitchell received a notice of termination from H.P., dated April 30, 1986. It was received by plaintiffs on May 16, 1986. After receiving advice from counsel, plaintiffs informed H.P. that timely notice had not been provided and that the Lease had automatically renewed. In response, Myron Berman, who helped to manage the building, telephoned Jordan on May 21, 1986 and threatened him with hostile treatment and the prospect of legal action if he persisted in taking this position.

During the two days following this conversation, plaintiffs' electricity and air con-

---

1. Myron J. Berman was also known to the defendants as "Mike" Berman.

2. The court will separately address defendants' motion for Rule 11 sanctions.

ditioning services were disrupted for about half a day. On one day, trash was allowed to accumulate in the building's fifth floor lobby near plaintiffs' office, although it was removed by that evening.

The parties' dispute as to whether the Lease had renewed was resolved when an agreement was reached to extend it after negotiation through counsel. The parties executed an Amendment to the lease, effective July 31, 1986, which substituted Jordan, Mitchell as the lessee and extended the Lease until the end of July 1989. It also contained a provision for the mutual release of "all claims heretofore having arisen under this Lease." The Amendment expressly provided that unless otherwise specified, the terms and conditions in the Lease would continue in effect. These included confession of judgment and rent adjustment provisions which were not discussed during negotiations and as to which the Amendment was silent.

The rent adjustment provision gives the lessor the right to charge the lessee as additional rent a proportionate share of increases in lessor's real estate taxes and operating expenses.[3] During the original term of the Lease, the provision had not been invoked and no additional rent had been demanded of plaintiffs under its terms.

In May of 1987 Myron Berman received a proposal from Metropolitan Management Corporation ("MMC") to perform property management services for buildings at 1920 Chestnut Street, the premises rented by plaintiffs, 1930 Chestnut Street and 219 North Broad Street. Arnold Berman, through H.P. Realty, owned the first two buildings, and the third was owned by a partnership in which Arnold Berman held a sixty percent interest and Myron Berman the remaining forty percent. H.P. accept-

ed the proposal and engaged MMC to perform property management services, one of which was to "[p]repare tenant bills for past due amounts, i.e. increased real estate taxes, [and] operating costs." After its review of H.P.'s financial situation prior to making a building improvement loan in September of 1985, General Electric Credit Corporation had alerted Myron Berman that H.P. was not collecting income to which it appeared to be entitled under the rent adjustment provisions.

On February 10, 1988, MMC billed Jordan, Mitchell for $1,416.20, an amount representing a proportionate share of increases in real estate taxes from 1982 to 1988. In October 1988, MMC billed Jordan, Mitchell for $19,991.23, an amount representing a proportionate share of increased operating expenses since 1981. This second bill also contained a prospective monthly adjustment for increased operating expenses. These amounts were subsequently amended by an invoice dated December 20, 1988, showing that $22,606.29 was due retroactively and $799.15 would be due prospectively each month.

Jordan, Mitchell paid the February 10, 1988 bill, purportedly without realizing what it was. It refused to pay the amounts billed in October and December. Jordan, Mitchell did not dispute the calculation of the adjustments, but rather maintained that it was not liable for these adjustments at all. In January 1989, after realizing that Jordan, Mitchell was not paying its share of operating costs, Myron Berman refused to pay PGW for service to the leased premises. To ensure continued service, Jordan, Mitchell had to assume the obligation of paying PGW thereafter.

The parties were unable to resolve their dispute. Jordan, Mitchell gave notice to H.P. in March 1989 that it would not be

---

**3.** The provision states:

Lessee further agrees to pay as rent in addition to the minimum annual rental herein a sum equal to the Lessee's proportionate share of any increase in real estate taxes assessed against or imposed upon the larger premises of which the demised premises are a part over the real estate taxes assessed against or imposed upon said larger premises for the year

1981 plus a sum equal to Lessee's proportionate share of any increase in the cost of the operation and maintenance of the larger premises of which the demised premises are a part over such cost for the year 1981. Lessee's proportionate share shall be 10% being the ratio that the number square feet contained in the larger premises on the date of this Lease, being 32,000 square feet.

renewing the lease which would therefore terminate effective July 31, 1989.[4] Based on defendants' claim for nonpayment of the rent adjustment, counsel acting on behalf of H.P. and Arnold Berman confessed judgment against plaintiffs on May 16, 1989 for $41,082.62 and obtained a writ of execution from the Prothonotary immediately thereafter. That day, the writ was served by the Sheriff upon Fidelity Bank, effectively attaching the Jordan, Mitchell corporate checking account maintained at that institution.

On May 24, 1989, plaintiffs filed a petition to open the judgment and obtained an order allowing them to substitute $10,000 in escrow for the garnished account. With the consent of defendants, the escrow was released on June 5, 1989. On July 21, 1989, the state court granted plaintiffs' petition, opened the confessed judgment and allowed plaintiffs to assert a defense. That litigation is still pending.

Ten of the 200 tenants at properties in which either Arnold or Myron Berman hold an interest disputed retroactive rent adjustments calculated by an accountant engaged by MMC and billed by MMC between the end of 1987 and the fall of 1988. Eight of these tenants leased space at 1930 Chestnut Street.

In two cases, the calculations were revised and the adjusted amounts were then paid. In two instances, tenants were allowed to pay the amounts due in monthly installments. In another case, the amount assessed was reduced and future adjustments were tied to the consumer price index ("CPI"). MMC credited one tenant with the amount considered past due. In one case, a tenant agreed to a new five year lease at a higher rent, a portion of which was in lieu of immediate payment of the rental adjustment. One tenant, the Better Business Bureau, was allowed to pay its adjustment by increasing monthly payments over the remainder of an existing lease. Other than Jordan, Mitchell, judgment was confessed against only one tenant. That dispute was amicably settled.

The final tenant who contested a retroactive assessment was Diversified Community Services ("DCS"). DCS rented space at 121 North Broad Street, a building owned by Ate–Kay Company ("Ate–Kay"). Ate–Kay is a partnership in which Myron Berman holds a one-third interest, but in which Arnold Berman holds no interest. On December 7, 1987, MMC, also engaged by Myron Berman to provide services for Ate–Kay, billed DCS for past due amounts under the rental adjustment provision. DCS refused to pay and gave termination notice in April 1988 for the end of July. On the ground that DCS had not paid its rental bill in full, Myron Berman instructed the building superintendent not to allow DCS to use the service elevator when vacating the premises on July 29, 1988. DCS sued to obtain access to the elevator. Myron Berman then consented to its use, and the lawsuit was settled.

## IV. DISCUSSION

### A. Plaintiffs' RICO Claim

■ To sustain a RICO claim, a plaintiff must establish a pattern of racketeering activity. *H.J. Inc. v. Northwestern Bell*, 492 U.S. 229, 237–39, 109 S.Ct. 2893, 2899–2900, 106 L.Ed.2d 195 (1989). To establish a pattern, there must be at least two predicate acts which satisfy both a continuity and relatedness test. *Id.* at 240, 109 S.Ct. at 2901. While a pattern requires at least two acts, two acts do not per se constitute a pattern. *Id.* at 237, 109 S.Ct. at 2899.

■ The relatedness prong requires that a defendant's acts have similar "purposes, results, participants, victims, or methods of commission." *Id.* at 240, 109 S.Ct. at 2901. The continuity test requires repeated conduct over a substantial closed period of time or conduct constituting a threat of continuing criminal activity. *Id.* Such a threat exists when a defendant is engaged in a "long-term association that exists for criminal purposes." *Id.* at 242, 109 S.Ct. at 2902. A civil RICO plaintiff must also

---

4. On April 1, 1989, Jordan, Mitchell ceased operation. After acquiring Mitchell's interest, Jordan sold to another architectural firm with which he then accepted employment.

demonstrate that he sustained an injury as a proximate result of one or more of the predicate acts constituting the pattern. *Town of Kearny v. Hudson Meadows Urban Renewal*, 829 F.2d 1263, 1268 (3d Cir. 1987).

■ While noting that the existence of such a pattern appeared doubtful, in the context of a motion to dismiss the court concluded that it could not be said beyond doubt that plaintiffs would be unable to prove that as a routine way of doing business defendants obtained monies from tenants by fraud or extortion.[5]

Plaintiffs contend that defendant Myron Berman committed predicate acts of mail fraud and Hobbs Act and ITAR extortion in May 1986. *See* 18 U.S.C. §§ 1341, 1951, 1952. "Extortion" is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear." 18 U.S.C. § 1951(b)(2).

Viewed most favorably to plaintiffs, a reasonable jury might find that during a one week period, Myron Berman mailed to plaintiffs a backdated termination notice, threatened Jordan during an interstate telephone conversation with hostile treatment and legal action when he contended that plaintiffs' lease had automatically renewed, and then caused a brief disruption of services to the Jordan, Mitchell premises.[6] The court will assume arguendo that these acts might be found to constitute an attempt to mislead and then coerce plaintiffs into abandoning a right to continued occupancy of their leased premises for an-

other year at the prevailing rent.[7] Plaintiffs, however, were neither misled nor coerced into abandoning their rights. They reserved all of their rights, obtained counsel and reached a satisfactory understanding with the lessor through armslength negotiation. Thus, it clearly appears that plaintiffs were not injured as a proximate result of these alleged predicate acts.

Plaintiffs also contend that defendants executed a scheme fraudulently to bill tenants retroactively for rental adjustments to which defendants knew they were not entitled, and caused the mails to be used in furtherance thereof.[8] Though not particularized, plaintiffs contend that predicate acts of mail fraud occurred when MMC billed tenants for rental adjustments.[9] Plaintiffs also maintain that defendants committed extortion when Myron Berman refused to let DCS use the service elevator when it was vacating its leased premises.

As noted, to be related, predicate acts must have similar purposes, results, participants, victims, methods of commission or distinguishing characteristics, and cannot be isolated events. *See H.J. Inc.*, 492 U.S. at 240, 109 S.Ct. at 2901. Myron Berman's activity in May 1986 was aimed solely at Jordan, Mitchell. The duration of the activity was one week and its purpose was to induce Jordan, Mitchell into forgoing a claimed right automatically to renew a lease for one year. The alleged fraudulent billing scheme began eighteen months later, spanned about ten months and was implemented by MMC as it reviewed ten-

---

5. The court noted that "This case appears to be a 'garden variety' landlord-tenant dispute that entails no substantial societal threat. Indeed, the conduct that plaintiffs label as criminal may well be aggressive, or at most tortious, conduct in the context of a classic landlord-tenant dis-pute." *See Berman*, 758 F.Supp. at 275.

6. No individual has been identified as committing any act of vandalism, and no direct evidence has been adduced that the disruption in services to Jordan, Mitchell was the result of Myron Berman's instructions to anyone. *See, e.g.*, Jordan Dep. at 22; Mitchell Dep. at 20.

7. A threat to do something which one is entitled to do is not extortion. *See Rothman v. Vedder Park Management*, 912 F.2d 315, 318 (9th Cir.

1990). A threat to initiate legal action, however groundless, has been held not to constitute extortion. *See I.S. Joseph Co., Inc. v. J. Lauritzen A/S*, 751 F.2d 265, 267 (8th Cir.1984).

8. Plaintiffs alleged acts of mail and wire fraud and interstate travel in aid of racketeering activity, however, in their submission in opposition to the summary judgment motion, they concentrate their focus on mail fraud.

9. Plaintiffs' assumption that MMC billed tenants by mail appears to be reasonable. *See* Exh's A, B, & D to Defs.' Exh. J.

ants' leases. The purpose was unrelated to questions of automatic lease renewal, but rather was to obtain retroactively additional amounts under existing leases. With the possible exception of DCS, there were no coercive acts.[10] The two groups of predicate acts relied on are not related.

Myron Berman's conduct over one week in May 1986 cannot satisfy the continuity requirement. There is no evidence that any defendant threatened or coerced any tenant in the intervening six years to forego a claimed right to an automatic lease renewal. There is no evidence of a repetition or threatened continuation of the purported billing scheme, the essence of which was to collect retroactively amounts claimed for costs incurred in particular prior years.

"Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy [the continuity] requirement: Congress was concerned with long-term criminal conduct." *Id.* at 242, 109 S.Ct. at 2902. "Virtually every garden-variety fraud is accomplished through a series of wire or mail fraud acts that are 'related' by purpose and are spread over a period of at least several months." *Marshall–Silver Constr. Co. v. Mendel*, 894 F.2d 593, 597 (3d Cir.1990) (noting Congress likely did not intend RICO to apply in the absence of conduct posing some significant societal threat).

Following *H.J.*, the Third Circuit has not found the continuity requirement to be satisfied in any case by the duration of the predicate acts alone and has held that twelve months or less is not a "substantial" period for RICO continuity purposes. *See Hughes v. Consol–Pennsylvania Coal Co.*, 945 F.2d 594, 610–11 (3d Cir.1991)

(fraud and threats to induce sales of property at sub-market prices over twelve months not sufficient); *Hindes v. Castle*, 937 F.2d 868, 875 (3d Cir.1991) (predicate acts over eight months insufficient to constitute pattern); *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406 (3d Cir.) (same), *cert. denied,* —— U.S. ——, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991); *Banks v. Wolk*, 918 F.2d 418 (3d Cir.1990) (same); *Marshall–Silver, supra* (predicate acts of mail fraud and extortion to secure money allegedly owed spanning seven months insufficient). *See also Meade v. Meade*, 1991 WL 243539, *4–6 (E.D.Pa. November 18, 1991) (dismissing RICO claim for want of continuity where predicate acts alleged spanned three year period), *reconsideration denied,* 1992 WL 6929 (E.D.Pa. Jan. 9, 1992).[11]

Even if the retroactive rent adjustments were billed fraudulently, this activity did not constitute "long-term criminal conduct" or the threat thereof sufficient to satisfy the continuity requirement. It certainly did not pose a significant societal threat of the type RICO was designed to address. Further, from the evidence of record, one cannot reasonably find that billing for these adjustments was fraudulent.

Plaintiffs contend that the rent adjustment provision in their lease did not survive the Amendment. They maintain that because the Amendment provided for particular rental payments, it effectively specified that the adjustment provision in the Lease was not extended. The Lease also provided for payment of specific amounts for rent. If some figure for rent were not agreed upon, one could hardly determine what amount was being adjusted to incor-

---

10. The court does not suggest that it is a crime for a landlord to seek to prevent the removal of all valuable property from its leased premises by a tenant in default or arrears.

11. Defendants also contend with force that individual plaintiffs lack standing to pursue any RICO claim. In a RICO action, "absent a showing of individual and direct injury, shareholders in a corporation injured by a third party in violation of RICO do not have standing to bring individual causes of action." *Flynn v. Merrick*, 881 F.2d 446, 450 (7th Cir.1989). That an indi-

vidual shareholder or employee may sustain harm incidental to the injury to the corporation does not confer standing upon him. *Warren v. Manufacturers National Bank of Detroit*, 759 F.2d 542, 545 (6th Cir.1985); *Motley Associates, Inc. v. Rumbaugh*, 104 B.R. 683, 686 (E.D.Pa. 1989). The same is true of plaintiffs' § 1983 claim. Initiating an action under 42 U.S.C. § 1983 does not alter the requirement that a plaintiff affiliated with a corporation sustain a *direct* individual injury to maintain standing. *Flynn v. Merrick, supra.*

porate a proportionate share of cost increases.

■ Plaintiffs alternatively contend that because Myron Berman was aware of the right to increased rent for at least 21 months before he retained MMC to calculate and collect it, he had abandoned a right to demand payment. Assuming that defendants may have jeopardized their claim for pre–1987 adjustments by delaying, it does not follow that they knowingly executed a fraud scheme by billing for them. Waiver and even the expiration of a statute of limitations are affirmative defenses. A creditor does not commit fraud by seeking payment of a claim to which a debtor may have an affirmative waiver defense which he may or may not assert.

■ While defendants might be found to have waived their right to collect retroactively adjustments for some or all prior years under principles of contract law, there is no evidence from which a jury reasonably could find that defendants knew or believed that they were not owed for the adjustments calculated and billed by MMC. To establish mail fraud, a prosecutor or plaintiff must demonstrate that a defendant wilfully participated in a scheme with knowledge of its fraudulent purpose and with the specific intent to defraud. *U.S. v. Montminy*, 936 F.2d 626, 627 (1st Cir.1991); *U.S. v. Pearlstein*, 576 F.2d 531, 537, 542 (3d Cir.1978).

The leases clearly provided for rental adjustments and this provision was not nullified in the amendment to plaintiffs' lease. A property management firm and one of the largest financial concerns in the country had advised Myron Berman that H.P. was entitled to collect these adjustments. While questioning a specific calculation, the Better Business Bureau acknowledged H.P.'s right to bill for rent adjustments. No other tenant has claimed to have been defrauded by this collection effort.

12. Mr. Jordan's scribbled notes were proffered well after plaintiffs alleged and testified that there was no discussion of the rental adjustment provision during negotiation of the Amendment.

■ The only thing offered by plaintiffs is Mr. Jordan's inadmissible unsupported opinion that Myron Berman had to know that Jordan, Mitchell would not have agreed to the Amendment if it had believed that it owed money for prior years. Plaintiffs point to a few handwritten abbreviated notes of Jordan of a portion of the negotiations between counsel at which he was present which contain a reference to the inclusion of "escalation of operating cost." Even if the parties orally agreed that the rent specified in the Amendment included adjustments for increased operating costs, it naturally and normally would have been set forth in the Amendment. Thus, proof of such an oral understanding would be barred by the parol evidence rule. *See Mellon Bank Corp. v. First Union Real Estate*, 951 F.2d 1399, 1405–07 (3d Cir.1991). In this case, the notes at most show that the subject may have been raised during negotiations, but not any agreement thereon. The date of the meeting for a portion of which Jordan was present was June 4, 1986. The agreement was executed effective July 31, 1986. The very same notes, for example, indicate that at one point the lessor proposed a renovation of the premises. Yet, the final agreement as executed expressly provides that plaintiffs take the premises "as is," and would receive three months rent free.

At the same time, plaintiffs contend that defendants' counsel was silent as to the rental adjustment provision during negotiation of the Amendment and for that reason the provision did not survive.[12] As noted, the Amendment expressly provided that unless otherwise specified, all of the terms of the Lease would remain in effect. Presumably, defendants were quite satisfied to have this provision remain in effect and thus had no reason to raise the subject. Plaintiffs seek to turn the Amendment on its head when they contend that the silence of *both* parties regarding a Lease provision signals agreement that it was extinguished upon execution of the Amendment.[13]

13. The issues of waiver and contract construction have been raised in the pending state court litigation between the parties which commenced with plaintiffs' petition to open the default judg-

Also, where a tenant disputes a rent adjustment billed pursuant to a lease provision or otherwise is aware that it is suspicious or erroneous, he cannot be found to have been deceived and thus injured as a result of receiving that bill. *See Forgash v. 919 Third Avenue Associates,* 1991 WL 196272, *2–3 (S.D.N.Y. Sept. 24, 1991) (plaintiff on notice that ground rent charge pursuant to escalation clause in lease was "worthy of suspicion"); *Ferndale Corp. v. Schulman Urban Dev. Associates,* 758 F.Supp. 861, 866 (S.D.N.Y.1990) (no reliance and thus no injury from predicate mail fraud act where tenant challenges invoice pursuant to increased operating costs adjustment provision in lease or pays it "with, at a minimum, speculation that the invoice was erroneous.")

The only evidence of causation proffered in this regard is Mr. Jordan's statement that Mr. Mitchell paid the February 10, 1988 invoice for $1,416.20 without realizing what it was. When questioned about how and when he realized that he should not have paid, Mr. Mitchell testified that "I can't remember how that all came about." The invoices sent by MMC to plaintiffs reference the lease and set forth the precise nature of the charges billed. In the invoice of February 10, 1988, MMC makes clear that Jordan, Mitchell was being billed for "your proportionate share of real estate taxes over the base year," specifies the increased amount for each year and attaches documents with the gross tax figures and calculation of the adjustment charge for each of the years in question. To find that plaintiffs, who acknowledge having copies of the Lease and Amendment, did not realize what they were paying, a juror would have to be more gullible than reasonable.

Few relationships in our society seem to engender more conflict than that of landlord and tenant. The aggressive landlord and the disgruntled tenant have almost become stereotypical. The instant case involves a typical landlord-tenant dispute about the construction of a lease and what sums or services the respective parties are entitled to. Permitting trash to accumulate for a day, disrupting utility service for half a day and vigorously pursuing a plausible contract interpretation are generally not the kind of things from which RICO cases are made. The actions of defendants and their agents, however characterized, do not pose the type of significant societal threat that RICO was designed to deter or penalize.

The court concludes that plaintiffs have failed to adduce evidence from which one reasonably could find a pattern of racketeering activity under prevailing case law, or that they sustained an injury proximately resulting from the purported predicate acts. Accordingly, summary judgment will be entered for defendants on plaintiffs' civil RICO claim.[14]

### B. § 1983 Claim

Plaintiffs also assert a claim under 42 U.S.C. § 1983 for deprivation of property without due process. Defendants argue that they are entitled to summary judgment on this on the basis of qualified immunity.

While expressly declining to decide the question, the Supreme Court suggested in *Lugar v. Edmondson Oil Co., Inc.,* 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982) that a qualified immunity might be available to a private party liable for utilizing constitutionally infirm albeit presumptively valid state procedures. *Id.* at 941 n. 23, 102 S.Ct. at 2756 n. 23.

On its face, § 1983 does not provide for immunity. Courts have implied an immunity defense, however, in circumstances where there was a tradition of immunity at common law and where there are compelling policy reasons for providing such im-

---

ment of May 16, 1989. That court denied plaintiffs' (defendants in that action) motion for judgment on the pleadings on March 16, 1990.

**14.** Because of this finding, the court need not resolve the question of whether Arnold Berman sufficiently participated or received sufficient benefit to be liable for the alleged racketeering acts of his agents. *See Berman,* 758 F.Supp. at 274 n. 2.

munity. *See Owen v. City of Independence,* 445 U.S. 622, 635, 100 S.Ct. 1398, 1407, 63 L.Ed.2d 673 (1980). This is premised, at least in part, on an assumption that when enacting § 1983 Congress would have contemplated the availability of those defenses available at common law for comparable or analogous tortious conduct.

One may reasonably question whether Congress in 1871 would have contemplated that a private party could be held liable at all under § 1983 for enlisting the aid of state officials in effecting an attachment of property, let alone what defenses might be available to such a person. It appears, however, that in determining the availability and scope of immunity, current policy considerations are more important than ancient common law principles. *See Anderson v. Creighton,* 483 U.S. 635, 644–45, 107 S.Ct. 3034, 3041–42, 97 L.Ed.2d 523 (1987) (noting that the Court had "completely reformulated qualified immunity [for public officials] along principles not at all embraced in the common law").

The Third Circuit has not addressed the issue of qualified immunity for private § 1983 defendants sued on a joint action theory. The seven circuit courts which have addressed the issue have reached diverse conclusions.[15]

The Ninth and Sixth Circuits have held that good faith or qualified immunity is not available to private § 1983 defendants. *F.E. Trotter, Inc. v. Watkins,* 869 F.2d 1312, 1318–19 (9th Cir.1989); *Duncan v. Peck,* 844 F.2d 1261, 1264 (6th Cir.1988); *Howerton v. Gabicia,* 708 F.2d 380, 385 n. 10 (9th Cir.1983). The Court in *Duncan* premised its holding on the absence of immunity for private parties at common law and the inapplicability to private parties of the policy considerations underlying qualified immunity for public officials.[16] These

considerations include the diversion of officials from public duties, the inhibiting of official action and the deterrence of able people from public service occasioned by the risk of liability and the burdens of litigation. *See Harlow v. Fitzgerald,* 457 U.S. 800, 816, 102 S.Ct. 2727, 2737, 73 L.Ed.2d 396 (1982).

The First and Tenth Circuits have held that qualified immunity is available to a private § 1983 defendant who is sued for acts undertaken at the behest of the state to assist the state in performing an essentially governmental function. *Frazier v. Bailey,* 957 F.2d 920 (1st Cir.1992) (private parties performing under contract duties statutorily required of state); *Rodriques v. Furtado,* 950 F.2d 805, 815 (1st Cir.1991) (private physician performing body cavity search to assist police in execution of search warrant); *DeVargas v. Mason & Hanger–Silas Mason Co., Inc.,* 844 F.2d 714, 722 (10th Cir.1988) (private security firm acting pursuant to contract with governmental agency). Conversely, the First Circuit has held that a private § 1983 defendant who voluntarily enlists the aid of the state for a self-interested purpose does not enjoy qualified immunity. *DeSantana v. Velez,* 956 F.2d 16, 19–20 (1st Cir.1992). *See also Downs v. Sawtelle,* 574 F.2d 1, 15–16 (1st Cir.1978).

While unique policy reasons exist for immunizing defendants in these circumstances, this approach seems more suited to a pre-*Lugar* determination of when a private party is a state actor than whether a private party acting under color of law is entitled to immunity. The purpose or motive of a private party utilizing state procedures per se has little to do with whether he reasonably should have known that he was violating a clearly established constitutional right. *Harlow,* 457 U.S. at 818, 102

---

**15.** It appears that the Supreme Court is prepared to address and hopefully provide future guidance on this issue. *See Wyatt v. Cole,* 928 F.2d 718 (5th Cir.), *reh'g. denied,* 934 F.2d 1263, *cert. granted,* —— U.S. ——, 112 S.Ct. 47, 116 L.Ed.2d 25 (1991). Defendants have asked the court not to defer acting in this case, *see* Dfdt. Memo. at 28 n. 57, and plaintiffs appear to concur.

**16.** Relying on the existence of a good faith or probable cause defense at common law to the torts of malicious prosecution and wrongful attachment, the Court in *Duncan* did recognize a good faith defense for a private § 1983 defendant who effected an attachment pursuant to a presumptively valid state statute. *Duncan,* 844 F.2d at 1267.

S.Ct. at 2738. The courts which recognize a qualified immunity for private § 1983 defendants, including the First Circuit in the limited context in which it has done so, have adopted the objective legal reasonableness test of *Harlow*.

The Eleventh, Eighth and Fifth Circuits have held that a private § 1983 defendant is entitled to the same qualified immunity as a public official in circumstances comparable to those in the instant case. *Jones v. Preuit & Mauldin*, 851 F.2d 1321, 1325 (11th Cir.1988) (en banc) (creditor effecting attachment under state statute of "highly questionable" constitutionality entitled to qualified immunity in § 1983 suit), *vacated on other grounds*, 489 U.S. 1002, 109 S.Ct. 1105, 103 L.Ed.2d 170 (1989); *Watertown Equipment Co. v. Norwest Bank Watertown*, 830 F.2d 1487, 1489–90 (8th Cir.1987) (private parties acting jointly with public officials to effect creditor remedies pursuant to state statutes enjoy qualified immunity), *cert. denied*, 486 U.S. 1001, 108 S.Ct. 1723, 100 L.Ed.2d 188 (1988); *Folsom Investment Co. v. Moore*, 681 F.2d 1032, 1037 (5th Cir.1982) (private party utilizing presumptively valid state attachment statute entitled to qualified immunity under *Harlow* standard).

These Courts have implied the availability of immunity to similarly situated private § 1983 defendants from the so-called defense of probable cause available at common law in wrongful attachment cases,[17] and found it to be justified by the important public policy of allowing citizens to rely on existing legal mechanisms to vindicate rights or resolve disputes. *See Jones*, 851 F.2d at 1324–25; *Buller v. Buechler*, 706 F.2d 844, 851 (8th Cir.1983); *Folsom*, 681 F.2d at 1037–38.

The court agrees that this is an important public interest sufficient to support qualified immunity in the circumstances alleged in this case. The court believes that it would be anomalous and unfair to hold that a private citizen acts under color of law for purposes of imposing liability when he enlists the aid of public officials and then to deny him the qualified immunity afforded to those officials, effectively making the former *more* liable than the latter. *See Jones*, 851 F.2d at 1325; *Buller*, 706 F.2d at 851. Further, while not facing the prospect of liability, many public officials likely would still be diverted from their official duties in such joint action cases by the need to provide discovery and trial testimony in § 1983 suits involving private parties with whom they acted in concert.

Consistent with these public interests, the court believes that affording private § 1983 defendants qualified immunity is preferable to adopting a subjective good faith defense. Just as "a reasonably competent public official should know the law governing his conduct," *Harlow*, 457 U.S. at 819, 102 S.Ct. at 2738, so should attorneys and creditors be encouraged to keep abreast of the applicable law in their fields of endeavor. Today, a variety of private parties are expected to take reasonable steps to familiarize themselves with an array of health, safety, environmental, tax and other laws and regulations pertaining to the conduct of their affairs. A subjective standard too easily could encourage deliberate ignorance and produce dramatically different results in cases involving similarly situated parties. There are many clearly established constitutional rights the violation of which reasonably should not be tolerated even by one acting without malice and in subjective good faith.

Accordingly, the court concludes that in a suit for utilizing an existing state attachment process later found to be constitutionally deficient, a private § 1983 defendant may assert the same type of qualified immunity afforded to public officials under *Harlow*.

 What the applicable law is and whether it was "clearly established" at the time of the act complained of are questions of law for determination by the court.

---

17. Actually, the burden of proving that an attachment proceeding was initiated without probable cause is on the plaintiff. *See* W. Prosser, *Handbook of the Law of Torts*, § 120 (4th Ed.1971). Thus, technically the courts have converted an element of a common law tort into an immunity defense.

*Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738.[18] In determining whether a constitutional right is clearly established for purposes of qualified immunity, a court must determine whether the contours of the right at the time of the alleged violation were sufficiently clear in light of pre-existing law that a reasonable person in defendant's position would understand that his conduct violated that right. *Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039. One acting under color of law is not required to predict the evolution of constitutional law, but is required to apply established legal principles to analogous factual situations. *People of Three Mile Island v. Nuclear Reg. Com'rs.,* 747 F.2d 139, 144 (3d Cir.1984). The purpose of qualified immunity is not to give state actors "one liability-free violation" of a constitutional right. *Id.* at 145.

The court in *Berman* did *not* hold that taking judgment by confession is unconstitutional. *Berman,* 758 F.Supp. at 278. A creditor is not precluded from obtaining judgment by confession and thereby securing priority over other creditors, obtaining a lien on real property, perfecting a claim for interest at the post-judgment rate or obtaining clear standing to secure assets upon a showing of fraudulent concealment or other exigent circumstances.[19] Rather, the court held that Pennsylvania's post-confessed judgment garnishment procedure fails to comport with due process because it does not provide for review and approval by an appropriate official invested with discretion, and does not ensure a prompt postseizure adjudication of the validity of the creditor's claim. *Id.* at 280.

The court agrees with the Eighth Circuit that by 1982, and thus ipso facto by 1989, it was clearly established, particularly in view

of *North Georgia Finishing, Inc. v. Di-Chem, Inc.,* 419 U.S. 601, 607, 95 S.Ct. 719, 722, 42 L.Ed.2d 751 (1975), that any statute which provided for prejudgment attachment of a debtor's bank account by a creditor without notice and an opportunity for a timely hearing, absent exceptional circumstances, violated the constitutional right not to be deprived or property without due process. *Watertown Equipment Co.,* 830 F.2d at 1490. *See also Jonnet v. Dollar Savings Bank of the City of New York,* 530 F.2d 1123, 1130 (3d Cir.1976). Today, virtually every state requires a hearing, proof of exigent circumstances or both before allowing an attachment of property. *Connecticut v. Doehr,* —— U.S. ——, 111 S.Ct. 2105, 2116, 115 L.Ed.2d 1 (1991).

The procedure at issue in the instant case permits attachment of a bank account immediately following entry of a confessed judgment. Over a decade ago, however, the Third Circuit en banc stated that the due process standards applicable in cases of prejudgment attachment "govern" and "control" in the context of a postjudgment seizure as well. *Finberg v. Sullivan,* 634 F.2d 50, 57–58 (3d Cir.1980) (en banc). By 1984, federal authorities had concluded that Pennsylvania's post-confessed judgment attachment and execution procedures did not adequately protect judgment debtors' due process rights. *See* FTC, Trade Regulation Rule: Credit Practices, 49 Fed.Reg. 7740, 7751 (1984). A three-judge panel had held the Illinois post-confessed judgment garnishment procedure unconstitutional for failure to ensure a hearing for the debtor at the time of execution. *Scott v. Danaher,* 343 F.Supp. 1272, 1277–78 (N.D.Ill. 1972).[20]

---

**18.** The objective legal reasonableness test which the court adopts is distinct from the subjective good faith defense defendants advanced earlier in their motion for reconsideration which was premised on their "innocent" state of mind.

**19.** A lien on the debtor's property does not per se deprive him of possession and use, or of the right to sell subject to the lien. *See B & P Development v. Walker,* 420 F.Supp. 704, 706 (W.D.Pa.1976); *In re Upset Sale, Tax Claim Bureau of Berks,* 505 Pa. 327, 334, 479 A.2d 940 (1984). The debtor can regain access to a gar-

nished bank account only by posting substitute security. *See Macioce v. Glinatsis,* 361 Pa.Super. 222, 228, 522 A.2d 94 (1987).

**20.** More recently, the Pennsylvania Procedural Rules Committee noted that the use of confession of judgment in Pennsylvania is "unparalleled" and that postjudgment procedures may result in the loss of a debtor's property prior to an opportunity to be heard on the validity of the judgment. *See Confession of Judgment: Request for Comment,* 20 Pa.Bull. 5198, 5199 (1990).

The attachment in *Finberg* occurred after the entry of a default judgment on a claim for which defendant acknowledged her liability. She successfully contended, however, that because Pennsylvania garnishment procedures did not require a prompt postseizure hearing on her claim of exemption, they failed to provide due process. Thus, after *Finberg* one would assume that a similar garnishment executed pursuant to a confessed judgment the basis of which is contested at least would be constitutionally suspect.[21] For purposes of due process, it is difficult to conclude that a judgment debtor is entitled to a prompt hearing on a claim that some of his attached property is exempt but not on a claim that all of his property has been attached unjustifiably or even fraudulently, on the basis of an unsupportable or even spurious pleading.

The pertinent considerations in either context are whether the applicable attachment procedures minimize the risk of an inappropriate seizure and ensure an opportunity to be heard in opposition at a meaningful time. *See Di–Chem*, 419 U.S. at 607, 608, 95 S.Ct. at 722, 723; *Fuentes v. Shevin*, 407 U.S. 67, 97, 92 S.Ct. 1983, 2002, 32 L.Ed.2d 556 (1972) (holding Pennsylvania replevin statute unconstitutional); *Finberg*, 634 F.2d at 58–59; *Jonnet*, 530 F.2d at 1129–30 (holding Pennsylvania foreign attachment procedures unconstitutional). *See also Allegheny Clarklift v. Woodbine Industries*, 356 Pa.Super. 269, 514 A.2d 606 (1986) (provision of state Landlord and Tenant Act permitting attachment of property at leased premises of defaulting tenant without prior notice and hearing violates due process).

If the Court in *Finberg* was only making a narrow point about social security recipients with income potentially exempt from attachment, it need not have discussed and relied upon four Supreme Court prejudgment seizure cases involving quite different circumstances, including *Di–Chem* in which the attachment of a corporate bank account was invalidated. The Court need not have stated that the case "presents the same interests that the Supreme Court sought to accommodate in the four prejudgment seizure cases" or that those cases "control the due process issue before us." *Finberg*, 634 F.2d at 58–59. The Court likely would not have referred to "any of a number of defenses" in addition to "a claim of exemption" available to a judgment debtor seeking to resist execution of a judgment. *Id.* at 58. Rather, it appears that the Court in *Finberg* was applying and logically extending established due process principles to the particular facts before it. This is what the court did in *Berman*.

That a procedure may be constitutionally suspect or even of "highly questionable" constitutionality, however, does not mean that a reasonable person could not believe it to be constitutional. *See Jones*, 851 F.2d at 1328. The development and application of due process standards in the property attachment context have been evolving. When governmental authorities continue to utilize a procedure, even one in "legal jeopardy," generally "it is not unreasonable for private actors to fail to quickly comprehend a developing body of doctrine that portends trouble for its constitutionality." *Wyatt*, 928 F.2d at 722.

The court concludes that in May of 1989 a creditor reasonably could have believed that the post-confessed judgment attachment procedure invoked in this case, while criticized and in some legal jeopardy, was

---

21. Default and confessed judgments have some important similarities. A default judgment is entered when a defendant ignores notice of a claim and an opportunity to be heard. A confessed judgment is entered when the defendant appears to have waived a right to notice and a hearing. Thus, both are entered against a person who has not had his proverbial "day in court." Both are subject to being open and set aside upon the requisite showing which in the case of each is markedly less than would be required to vitiate a post-trial judgment. The Supreme Court has at least suggested that absent an opportunity for a debtor timely to vacate a confessed judgment upon a showing of a valid defense, a procedure for judgment by confession would not withstand constitutional scrutiny. *See D.H. Overmyer Co., Inc. of Ohio v. Frick Company*, 405 U.S. 174, 188, 92 S.Ct. 775, 783, 31 L.Ed.2d 124 (1972) (execution of cognovit clause did not render debtor "defenseless").

not clearly constitutionally deficient. Accordingly, defendants are entitled to qualified immunity from liability on plaintiffs' § 1983 claim.

## C. State Law Claims

 Plaintiffs also assert that in billing and taking judgment for rental adjustments defendants knew were not owed, they committed fraud. Again, plaintiffs rely on the contention that the rental adjustment provision in their lease did not survive the Amendment.

Defendants' asserted belief that this provision remained in effect is supported by the plain language of the Amendment and is eminently reasonable on the face of the record. From the evidence adduced one cannot reasonably find that Myron Berman or MMC *knew* the rental adjustment bills to be false, or that plaintiffs *justifiably* relied on them and were injured as a proximate result thereof. *See Sowell v. Butcher & Singer, Inc.*, 926 F.2d 289, 296 (3d Cir.1991); *Spivack v. Berks Ridge Corp., Inc.*, 402 Pa.Super. 73, 79, 586 A.2d 402 (1990).

Defendants have filed a contract counterclaim for the amounts claimed from Jordan, Mitchell under the rental adjustment provision. In the absence of complete diversity between defendants and plaintiffs, there is no independent jurisdictional basis over this claim. Pursuant to 28 U.S.C. § 1367(c)(3), a district court may decline to exercise its supplemental jurisdiction if all claims over which it had original jurisdiction have been dismissed. This very contract claim is the subject of litigation between the parties in the ongoing state court proceedings. The court will decline to exercise jurisdiction over defendants' contract counterclaim.

An appropriate order will be entered.

## ORDER

AND NOW, this 1st day of May, 1992, upon consideration of defendants' Motion for Summary Judgment and plaintiffs' response thereto, consistent with the accompanying memorandum, IT IS HEREBY ORDERED that said Motion is GRANTED and JUDGMENT IS ENTERED on plaintiffs' claims in favor of defendants and against plaintiffs.

IT IS FURTHER ORDERED that defendants' counterclaim is DISMISSED without prejudice to the parties' claims in the litigation regarding the same subject matter pending in the Pennsylvania courts, and accordingly the above-captioned case is CLOSED.