OPINION OF THE COURT
ROTH, Circuit Judge:
In this action, brought under the Racketeer Influenced and Corrupt Organizations Act (“RICO”), Pub.L. 91-452, Title IX, 84 Stat. 941, as amended, 18 U.S.C. §§ 1961— 1968, we are presented with the question whether defendants’ acts, as alleged, constituted a “pattern of racketeering activity.” Specifically, we must determine what showing is required for plaintiffs to meet the “continuity” prong of RICO’s “pattern” requirement. Because we find that plaintiffs have alleged a series of acts sufficient to satisfy RICO’s continuity requirement, we will reverse the district court’s grant of summary judgment and remand this case for further proceedings consistent with this opinion.
*1282 The plaintiffs are four of the executors of the Estate of Charles Tabas (“the Estate”): Charles’s widow, Harriette Tabas; Richard Tabas and Nancy Tabas, two of Charles and Harriette’s children; and Gerald Levinson, one of Charles’s business associates.[1] In addition to Daniel Tabas, who is President and Chief Executive Officer of Tabas Enterprises, the named defendants include Joseph Campbell, the Executive Vice President of Tabas Enterprises; James MeSwiggan, the Comptroller of Tabas Enterprises; Daniel’s children; and one of Daniel’s sons-in-law.
I.
A.
In 1964, brothers Charles and Daniel Ta-bas formed a partnership, Tabas Enterprises, to conduct real estate and other business ventures. The partnership agreement governing the brothers’ joint property holdings required that, in the event of the death of either partner, the surviving partner would distribute partnership income equally to himself and to the estate of the deceased partner, regardless of any personal services either brother might render. See Appendix (“App.”) at 62 (Partnership Agreement ¶ 3). The partnership agreement also provided that:
It is the intent of the parties that the survivor of them shall be free to exercise his judgment for the joint benefit of ownership ... provided always, that the responsibility and obligation of the survivor to the estate of the deceased shall be that required of a fiduciary.
App. at 62 (Partnership Agreement IF 4(b)).
In 1983, Charles Tabas died. Soon after Charles’s death, John Van Der Wal, a financial advisor to Daniel and to Tabas Enterprises, was asked by Daniel to recommend a reasonable financial arrangement between Daniel and Charles’s widow, Harriette. In response, Van Der Wal sent a letter to Har-riette in which he recommended that Daniel receive a $180,000 annual management fee from Tabas Enterprises, prior to profit sharing by the partners. Van Der Wal further recommended that Harriette and Daniel each receive a $10,000 monthly draw check from Tabas Enterprises.[2]
Beginning in March 1983, monthly distribution checks of $10,000 were drawn on a Tabas Enterprises account and sent to Har-riette through the United States mail. Daniel was also provided with a $10,000 monthly draw. In addition, from March 1983 to September 1986, Tabas Enterprises paid for various personal expenses incurred by Harriette and Daniel.
In September 1986, Tabas Enterprises stopped paying Harriette’s personal expenses and also eliminated Harriette’s $10,000 monthly draw. Instead, Tabas Enterprises began paying a $15,000 monthly draw to the Estate. At the same time, Daniel’s monthly draw was increased to $15,000. Tabas Enterprises continued to pay Daniel management fees and to cover his personal expenses.[3]
Shortly thereafter, the Estate brought suit against Daniel and others in the Montgomery County, Pennsylvania, Court of Common Pleas. The complaint alleged, inter alia, that the Estate was not being allocated an equal share of the partnership income, that Daniel used Tabas Enterprises funds for per *1283 sonal purposes, that Daniel misled the Estate by directing the preparation of false and misleading financial statements, and that Daniel had breached his fiduciary duties to the Estate.
On November 20, 1987, the parties settled the state suit and agreed that the assets of Tabas Enterprises would be sold. The settlement agreement established a schedule and method for liquidating the majority of the jointly held properties.[4] In conjunction with the liquidation of the joint assets, the settlement agreement provided that “the Estate shall be given complete access to all properties, books and records in connection therewith!.]” App. at 67 (Settlement Agreement at ¶ 4(a)(i)). The settlement agreement did not address the distribution of income earned after November 20, 1987, but did provide that:
To the extent that the Partnership Agreement dated March 12,1964 is not inconsistent with the provisions of this [Settlement] Agreement, the Partnership Agreement shall continue in full force and effect until the liquidation and auction [of Tabas Enterprises’ assets] are completed.
App. at 70 (Settlement Agreement ¶ 13). Another provision of the settlement agreement provided that the parties would agree to execute a mutual general release:
requiring the dismissal with prejudice of all parties in all litigation between or among Daniel, on the one hand, and the Estate or any of its executors, on the other hand, and excluding only the terms and conditions contained herein.
App. at 69 (Settlement Agreement ¶ 9).
Lastly, the Honorable William H. Yohn, Jr.,[5] was named to act as the arbitrator of any future disputes arising from the implementation of the settlement agreement that could not be resolved by the parties’ legal representatives. The settlement agreement specifically provided that Judge Yohn’s decisions on such matters “shall be final, binding, and non-appealable.” App. at 70 (Settlement Agreement ¶ 12).
On May 15, 1990, Daniel and the Estate executed the mutual general release, which provided that, except for the obligations of the parties under the settlement agreement, the parties would release and forever discharge one another from:
any and all actions, causes of action, demands, judgments, contracts, debts, dues, accounts, bonds, covenants, contracts, suits, claims, and demands of any nature whatsoever, whether in law, equity, arbitration or otherwise, whether know [sic] or unknown at the present time, which [either party] ever had, now has, hereinafter can, shall or may have, by reason of any matter, cause or thing whatsoever, from the beginning of the world, to November 20, 1987.
App. at 293 (emphasis added).
Despite the settlement agreement, plaintiffs remained dissatisfied with Daniel’s compliance with the partnership agreement. On July 25, 1990, Judge Yohn held a hearing to consider whether the settlement agreement barred the Estate from asserting claims for breach of the partnership agreement stemming from Daniel’s management of Tabas Enterprises subsequent to November 20, 1987. Finding that “[t]he provision of the partnership agreement of March 12, 1964 concerning distribution of income is not inconsistent with the provisions of the settlement agreement ... as the settlement agreement contains no provisions concerning the distribution of income after November 20, 1987,” Judge Yohn held that the Estate could *1284 “pursue any claims” against Daniel arising from the distribution of Tabas Enterprises’ income after November 20, 1987. App. at 1187 (Arbitration Award No. 8).[6]
Following this decision, Daniel’s counsel requested that Judge Yohn mediate the issues raised by plaintiffs’ proposed RICO complaint. Judge Yohn held two conferences with counsel to discuss, among other topics, the proposed RICO claims. During oral argument on February 1,1991, Daniel’s counsel asserted that, because plaintiffs’ proposed RICO complaint sought damages against defendants not named in the settlement agreement, the proposed RICO complaint was outside the scope of arbitration and therefore could not be decided by Judge Yohn in his role as arbitrator. Nevertheless, Daniel’s counsel expressed interest in having Judge Yohn serve as a mediator in an attempt to resolve the claims set forth in the proposed RICO complaint.
On February 20, 1991, Judge Yohn formally denied Daniel’s request to mediate the dispute. Instead, Judge Yohn ordered that: “By agreement of the parties, and with the concurrence of the undersigned, the proposed ‘RICO Complaint’ may be filed in the United States District Court for the Eastern District of Pennsylvania and the issues raised therein will not be the subject of this procedure under the [Settlement] Agreement of November 20, 1987.” App. at 1282 (Arbitration Award No. 10).
Soon thereafter, plaintiffs brought the instant action, alleging violations of RICO §§ 1962(a), (b), (c), and (d), as well as several state law claims stemming from defendants’ handling and distribution of Tabas Enterprises assets. The initial complaint was filed on March 4, 1991. The amended complaint was filed on May 20, 1991.[7]
Plaintiffs have appealed the district court’s grant of defendants’ motion for summary judgment. On appeal, we are required to base our review of the district court’s decision on the evidence of record. Accordingly, before we turn to the merits of the parties’ assertions, we will summarize the record submitted to this court.
Most significantly, the record contains two financial reports by Price Waterhouse, analyzing Tabas Enterprises’ financial and operational records. Plaintiffs’ counsel retained Price Waterhouse to determine whether these records reflected the equal distribution of income to the Estate as required under ¶ 3 of the partnership agreement.
The first Price Waterhouse report analyzed Tabas Enterprises’ financial records dating from Charles’s death in 1983 through early 1990, focusing on the period after November 20, 1987. Then, in late 1991, after the amended complaint was filed, Price Wa-terhouse completed a supplemental report, analyzing Tabas Enterprises’ records from October 1989 through July 1991. In total, the Price Waterhouse reports documented more than three and one-half years of activity subsequent to the November 1987 settlement agreement. In both reports, Price Wa-terhouse concluded that “the books and records of Tabas Enterprises do not reflect the equal distribution of income,” and that “indications of fraud exist.”[8] App. at 352, 460-61.
*1285 The Price Waterhouse reports revealed a continuing series of transactions to divert Tabas Enterprises’ income for the personal use of Daniel and his family, through direct monetary benefits as well as other types of benefits. In its first report, for instance, Price Waterhouse itemized a substantial number of items, purchased with Tabas Enterprises’ income, for which there was no adequate documentation or explanation substantiating an ordinary and necessary business purpose for the expense. The report noted that, to the extent that Daniel purchased these items using Tabas Enterprises’ income, such expenses “would inappropriately reduce the Estate’s interest in Tabas Enterprises by reducing income available for distribution to the Estate.” App. at 354. According to the Price Waterhouse report, these purchases included personal apparel, homeowner’s dues for Daniel’s vacation home in Vermont, meals and other purchases in cities where Daniel had vacation homes, meals and other purchases in ten foreign countries, prescription medicine, and a pool heater installed at Daniel’s home in Pennsylvania. The total cost of these and other similar expenses was approximated at $140,-000.
Other problem areas cited in the first report were Tabas Enterprises’ payment of $67,000 in compensation for the provision of home services, such as maid, gardening, and handyman services, for Daniel and his family; the assignment of 24 automobiles owned by Tabas Enterprises to Daniel and his family, including family members who were not employed by Tabas Enterprises; Tabas Enterprises’ payment of the automobile insurance, repairs and maintenance, gasoline,[9] car phones, auto club membership, registration fees, tags, and title fees for all 24 cars; Tabas Enterprises’ payment of telephone bills for Daniel’s primary and vacation residences; and Tabas Enterprises’ payment of insurance coverage for nonpartnership assets, including Daniel’s six antique automobiles.
Price Waterhouse’s second report noted that, between the completion of the first and second reports, Daniel had reimbursed Tabas Enterprises for only a small portion of these expenses.[10] The second report also noted that many of the questionable expenses detailed in the first report continued to occur. For instance, the second report identified an additional $78,000 in payments for personal services and an additional $35,000 in phone bills for Daniel’s private residences and mobile telephones. The second report also noted that Daniel and his family continued to charge personal items to Tabas Enterprises, including personal apparel, homeowner’s dues for his vacation home in Vermont, and meals.
In addition to investigating nonmonetary benefits, the Price Waterhouse reports also examined the direct monetary benefits received by Daniel and his family from Tabas Enterprises. The reports found that between November 1987 and November 1989, Daniel received $1,502,000 in salary partnership distributions, management fees and incentives, gratuities, and bonuses from Tabas Enterprises, and that for the period between November 1989 and June 1991, he received $1,166,000. The reports also found that, during this period, in which Daniel was paid a total of $2,668,000, the Estate received partnership distributions totalling $660,000.[11]
According to the Price Waterhouse reports, the monetary payments to Daniel’s family during this time also eclipsed those *1286 received by the Estate. The reports documented that between November 1987 and June 1991, Daniel’s family, including his six children and one son-in-law, received $1,363,-000 from Tabas Enterprises in the form of salaries, management fees and incentives, gratuities, bonuses, and consulting fees. The amended complaint alleges that payments to Daniel’s children and son-in-law “do not constitute reasonable salaries for work which they actually performed and that some of those children and/or their spouses were ‘phantom’ or ‘ghost’ employees who performed little or no work at all.” App. at 21 (Amended Complaint (“AC”) ¶ 25).
The first Price Waterhouse report also noted that, in addition to receiving compensation from Tabas Enterprises, certain members of Daniel’s family also worked for and received compensation from Royal Bank. For instance, Lee Tabas served as President of Royal Bank, Robert Tabas served as Vice President, and Susan Tabas Tepper served as Director of Marketing.
■ Finally, in addition to the above findings, both Price Waterhouse reports noted that “the Estate may also have been subjected to the risk of additional taxes, interest, and penalties” due to apparent Internal Revenue Service reporting violations by Tabas Enterprises. App. at 362, 467.
B.
Count I of the amended complaint alleges that, in violation of 18 U.S.C. § 1962(a), (b), and (c), the defendants conspired to defraud the Estate of its equal share of Tabas Enterprises’ income, to which it was entitled under the partnership agreement, through a pattern of racketeering activity including mail fraud in violation of 18 U.S.C. § 1341.[12] Specifically, plaintiffs allege that defendants conducted a scheme to defraud the Estate of its equal share of the partnership’s income by wrongfully diverting Tabas Enterprises’ funds to pay for the personal expenses of Daniel and his family and by understating the Estate’s share of the income. Plaintiffs assert that, from the time of Charles’s death through the period in which the amended complaint was filed, Daniel “continuously made false representations to the Estate by mail and fraudulently distributed millions of dollars of Tabas Enterprises’ funds to himself and to members of his family in a scheme to defraud the Estate of income to which it was entitled.” App. at 20 (AC ¶ 24).
Plaintiffs specifically allege that Daniel, Campbell, and McSwiggan committed forty-one acts of mail fraud between December 1987 and February 1991 for “the purpose of executing the scheme to defraud the Estate of its equal share of income.” App. at 43 (AC ¶49).[13] Thirty-nine of these forty-one acts represented monthly disbursements of $15,000 from Tabas Brothers (a holding of Tabas Enterprises) to the Estate. The remaining two acts involve the mailing of various IRS forms from Tabas Enterprises to the Estate reflecting income earned and business expenses incurred by certain Tabas Enterprises’ entities. Plaintiffs contend that the mailing of the monthly checks by defendants “constituted an intentional misrepresentation” that one-half of the income of Ta-bas Enterprises was being paid to the Estate pursuant to the partnership agreement. App. at 46 (AC ¶ 50).
Finding that the dispute did not present a sufficient threat to satisfy RICO’s “continuity” requirement, the district court granted *1287 defendants’ summary judgment motion. The district court reasoned that:
Plaintiffs’ claims essentially allege one fraudulent scheme perpetrated against one victim by one perpetrator. The gist of plaintiffs’ complaint is that Daniel Tabas has failed to abide by the partnership agreement made with his brother, Charles, and that Daniel has employed various methods of trickery to cheat Charles’s heirs of their fifty percent share of the business that Charles and Daniel buflt. The sole victim of this scheme is Charles Tabas’s estate. The sole perpetrator is Daniel Tabas or individuals under his control. No one else is affected. There is no threat to the community at large. This is not a case where the predicate acts are “part of an entity’s regular way of doing business,” such as would affect others doing business with the entity.
The partnership between Charles and Daniel is currently in the process of liquidation. All of the fraudulent activity alleged in this suit will cease once the liquidation process is complete. Given the Court of Appeals’ admonition that “[i]t remains an open question whether RICO liability is ever appropriate for a single-scheme, single-victim conduct threatening no future harm,” we simply do not find that the defendants’ alleged conduct in this case “pose[s] a societal threat worthy of the draconian penalties and remedies available under RICO.”
District Court opinion at 8-10, 1992 WL 121600; App. at 1376-78 (citations omitted) (footnotes omitted). Plaintiffs filed a timely notice of appeal of the district court’s grant of summary judgment to defendants. Defendants also filed an appeal, seeking review of the district court’s decision to dismiss the state claims without prejudice. Following the filing of the panel’s decision, we granted appellants’ petition for rehearing in banc and vacated the panel opinion.
ii.
The district court had subject matter jurisdiction over this civil action pursuant to 28 U.S.C. §§ 1331 and 1367. The district court’s federal question jurisdiction was invoked because Counts I and II of the amended complaint raise claims under RICO, 18 U.S.C. §§ 1961 and 1962. The district court’s supplemental jurisdiction was invoked because Counts III through VI of the amended complaint raise claims that are so related to the claims in Count I and II that they form part of the same case or controversy under Article III of the United States Constitution. Under 28 U.S.C. § 1291, this Court has appellate jurisdiction over the final orders of the district court.[14]
This Court has plenary review over the district court’s grant of summary judgment. See Northern Ins. Co. v. Aardvark Assocs., 942 F.2d 189, 194 n. 5 (3d Cir.1991). On review of the district court’s order for summary judgment, “we ‘apply the same test the district court should have utilized initially.’ ” Erie Telecommunications v. Erie, 853 F.2d 1084, 1093 (3d Cir.1988) (citations omitted). “In reviewing a grant of summary judgment, we must be convinced ‘that the prevailing party has successfully demonstrated that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.’ ” Id. (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)).
In determining whether summary judgment is appropriate, “[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.” Anderson, 477 U.S. at 255, 106 S.Ct. at 2513. The inquiry is “whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.” Id. at 251-52, 106 S.Ct. at 2512.
*1288 III.
The first issue we must address is defendants’ contention that this lawsuit is precluded by the 1987 settlement agreement and the 1990 mutual release. This question was considered by the panel only. We find defendants’ argument to be without merit.
First, binding arbitration by Judge Yohn holds the present claims viable. The settlement agreement provides for final, binding arbitration of any dispute “as to the provisions of this Agreement or as to the implementation or operation of the provisions of this Agreement” between Daniel and the Estate. App. at'70 (Settlement Agreement ¶ 12). The very issue of whether claims such as this lawsuit could be brought was submitted to Judge Yohn, the arbitrator, who determined initially that “the arbitrator has jurisdiction to rule upon the issue of whether the Estate may make claims against Daniel M. Tabas concerning his management of Tabas Enterprises subsequent to November 20, 1987.” App. at 1185 (Arbitration Award No. 8). On the merits, Judge Yohn held that the Estate could pursue any claims which it might have against Daniel “for an alleged breach of his fiduciary duty [to the Estate] after November 20, 1987,” and “for the unequal distribution of the income of Tabas Enterprises' subsequent to November 20, 1987.” Id. at 1187.
Under the settlement agreement, Judge Yohn’s decision is “final, binding, and non-appealable,” app. at 70 (Settlement Agreement ¶ 12), and we must adhere to it under federal and Pennsylvania law. See Apex Fountain Sales v. Kleinfeld, 818 F.2d 1089, 1094-95 & n. 4 (3d Cir.1987) (an arbitrator’s decision is binding under federal law unless “an arbitrator ‘manifests an infidelity’” to her obligation to interpret the agreement at issue, or there is “corruption, fraud or partiality,” or a party was denied a “fundamentally fair hearing”) (citations omitted); International Brotherhood of Firemen & Oilers v. School Dist., 465 Pa. 356, 350 A.2d 804, 808 (1976) (an arbitrator’s decision shall not be set aside “unless it is alleged and proven by clear, precise and convincing evidence that the parties were denied a hearing or that there was fraud, misconduct, corruption or some other irregularity of this nature on the part of the Arbitrator which caused him to render an unjust, inequitable or unconscionable finding”). Defendants have not alleged any action on the part of Judge Yohn amounting to corruption, fraud, or partiality. In addition, defendants have presented no evidence that Judge Yohn failed to provide a hearing to consider each party’s views prior to his decision. In fact, the record clearly indicates that Judge Yohn held a hearing on this question and considered numerous exchanges of correspondence before ruling on this matter.
Second, even if we were to make our own evaluation of whether the 1987 settlement agreement and the 1990 release precluded this lawsuit, we would conclude that it does not. Defendants’ rebanee on Main Line Theatres, Inc. v. Paramount Film Distrib. Corp., 298 F.2d 801 (3d Cir.), cert. denied, 370 U.S. 939, 82 S.Ct. 1585, 8 L.Ed.2d 807 (1962), is misplaced. Defendants assert that Main Line stands for the proposition that where “the initial lawsuit contained prayers for injunctive rebef, the execution of a general release releases and extinguishes complaints for future conduct.” Defendantsappellees’ Brief at 21. Consequently, defendants contend, plaintiffs’ suit is barred by the settlement agreement and the mutual release signed by the Estate and Daniel.
In Main Line, plaintiffs demanded injunc-tive relief and treble damages in a civil antitrust suit stemming from Paramount’s distribution of motion pictures. The district court dismissed the suit, holding that the case had been settled during pre-trial negotiations by an “oral agreement” between the parties. The oral agreement provided that Main Line would drop its suit in exchange for $10,000. Main Line refused to comply with the oral agreement, however, complaining that Paramount attempted to add language to the agreement when it was memorialized in writing. Specifically, Main Line rejected language that required it to acknowledge that the complained of distribution procedures were reasonable.
Main Line appealed the dismissal to this court. We then considered whether the ini *1289 tial oral agreement included a release to the effect that Paramount could continue to distribute films in the same manner it had prior to Main Line’s suit for injunctive relief. We noted:
Had this been an action for damages only, without a prayer that the defendants be restrained from continuing or repeating the licensing practices of which the plaintiff complained, the essential feature of any understanding to settle the suit for a stated sum would have been the plaintiffs’ promise to forego a money claim, the only matter in controversy. Here, the suit contained a demand for injunctive prohibition of future wrongful conduct as well as a claim for money damages for alleged past misconduct. In such circumstances a reasonable person agreeing, without any expression of limitation, to accept a sum in settlement of the litigation should and reasonably would understand that both aspects of the suit were covered by the settlement.
298 F.2d at 803 (emphasis added).
In Main Line, plaintiffs could point to no limitations, expressed or implied, in their oral agreement with defendants. Accordingly, their settlement agreement covered their prayers for both injunctive relief and money damages. In the present case, however, the mutual release signed by plaintiffs and Daniel expressly limits the applicability of the release to any claims arising “from the beginning of the world to November 20, 1987.” App. at 294. This express limitation distinguishes the instant case from the facts presented in Main Line.
Defendants also draw the Court’s attention to our statement in Main Line that “[c]er-tainly, a defendant offering a sum in settlement of a suit asking, among other things, for an injunction against similar conduct, would not understand that a similar demand could be asserted the day after settlement.” 298 F.2d at 803 (emphasis added). The Estate’s state suit here, however, although denominated a “Complaint in Equity,” did not seek broad injunctive relief. The holding in Main Line relies on the fact that the plaintiff specifically sought to enjoin Paramount from distributing motion pictures using methods that plaintiff alleged violated the civil antitrust laws. In the instant case, the plaintiffs’ state suit asked that Daniel be removed from any position at Tabas Enterprises and that its businesses and properties be liquidated. Rather than controlling future conduct, the state suit primarily sought a dissolution of Tabas Enterprises and redress for the alleged past wrongs committed against the Estate’s interest in the partnership. It follows, therefore, that the subsequent federal action did not constitute an effort to enjoin conduct that the settlement of the first suit had resolved. This determination, together with our earlier finding that the settlement agreement bars only claims existing up to November 20, 1987, would lead us to conclude that defendants’ reliance upon Main Line is misplaced.
IV.
Having found that plaintiffs’ lawsuit is not precluded by the 1987 settlement agreement and the 1990 mutual release, we now turn to the district court’s decision that plaintiffs failed to allege a course of conduct sufficient to establish a RICO “pattern of racketeering conduct” because plaintiffs failed to satisfy RICO’s “continuity” requirement.
The RICO statute provides for civil damages for “any person injured in his business or property by reason of a violation of [18 U.S.C. § 1962].” 18 U.S.C. § 1964(c). A common thread running throughout § 1962 is that an injured party must demonstrate that the defendant was engaged in a “pattern of racketeering activity.” Section 1962(a) prohibits “any person who has received any income derived ... from a pattern of racketeering activity” from using that money to acquire or operate any enterprise engaged in interstate commerce. Section 1962(b) prohibits any person from acquiring, maintaining an interest in, or controlling any such enterprise “through a pattern of racketeering activity.” Section 1962(c) prohibits any person employed by or associated with an enterprise engaged in interstate commerce from conducting or participating in the affairs of the enterprise through “a pattern of racketeering activity.” Finally, section 1962(d) *1290 prohibits any person from conspiring to violate subsections (a), (b), or (c).
Central to the dispute in this case is the question whether defendants participated in “a pattern of racketeering activity.” The RICO statute defines a “pattern” of racketeering activity as requiring “at least two acts of racketeering activity” within a ten year period. 18 U.S.C. § 1961(5). The statute also enumerates the offenses which constitute “racketeering activity,” including crimes that have traditionally been associated with the transgressions of racketeers: murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, and dealing in narcotic or other dangerous drugs. 18 U.S.C. § 1961(1). The statutory enumeration is, however, expansive and goes on to include specific federal offenses which, although they may often be committed by those whom we would categorize as “racketeers,” also fall into the category of common law or “garden variety” fraud and which would, in the past, have been the subject of commercial litigation under state law. Among these broadly delineated federal offenses are mail fraud and wire fraud.[15] These offenses are the ones that many consider to be the most troublesome as RICO predicate acts. The inclusion within the scope of civil RICO of these types of fraud, more prevalent in the commercial world than in the world of racketeers, has caused concern that RICO sweeps too broad a swathe. See, e.g., Note, Civil RICO: The Temptation and Impropriety of Judicial Restriction, 95 Harv.L.Rev. 1101, 1105 (1982) (“Given the prevalence of mail and wire use in commercial transactions, RICO’s provision for a private cause of action predicated on violations of the mail and wire fraud statutes virtually federalizes common law fraud”).
If we examine the language of the statute itself, in an attempt to discern the scope of civil RICO, we find ourselves lost in a land with few signposts. Section 1961(5) defines “pattern” as requiring “at least two acts of racketeering activity.” The breadth of the predicate acts, described in § 1961(1), combined with § 1961(5)’s loose definition of pattern, has led many courts to recoil from the inclusion within RICO of offenses which were not considered to be the crimes of gangsters. Such court-imposed limitations on the scope of civil RICO were first reviewed by the Supreme Court in Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). In Sedima, the Supreme Court set out an expansive definition of the concept of “pattern” in civil RICO.
Sedima arose from an action filed in the Eastern District of New York by a Belgian corporation, based on § 1964(c) and (d) and predicate acts of mail fraud and wire fraud, charging that Imrex, Sedima’s partner in a joint venture, had presented inflated bills and had cheated Sedima out of a portion of its proceeds by collecting for nonexistent expenses. The district court dismissed the RICO counts for failure to state a claim, *1291 holding that a RICO-type injury must be based on allegations of some sort of distinct “racketeering injury” or “competitive injury.” 574 F.Supp. 963, 965 (1983). The dismissal was affirmed by a divided panel of the Second Circuit Court of Appeals. 741 F.2d 482 (1984). The court of appeals clarified the type of injury which it required to be alleged, finding that “it is better to identify the RICO standing requirement as a ‘racketeering injury’ requirement rather than a ‘competitive injury’ requirement_” Id. at 496. The court of appeals further required that, before a private civil RICO action could be brought, the plaintiff must show that the defendants had been criminally convicted of the predicate acts. Id. at 503. The Supreme Court rejected both of these holdings.
Justice White, writing for the majority in Sedima, stated “we can find no support in the statute’s history, its language, or considerations of policy for a requirement that a private treble-damages action under § 1964(c) can proceed only against a defendant who has already been criminally convicted.” 473 U.S. at 493, 105 S.Ct. at 3283. Concerning the requirement of racketeering injury, Justice White stated that
[W]e perceive no distinct “racketeering injury” requirement. Given that “racketeering activity” consists of no more and no less than commission of a predicate act, § 1961(1), we are initially doubtful about a requirement of a “racketeering injury” separate from the harm from the predicate acts. A reading of the statute belies any such requirement.... If the defendant engages in a pattern of racketeering activity in a manner forbidden by these provisions [§ 1962(a)-(c) ], and the racketeering activities injure the plaintiff in his business or property, the plaintiff has a claim under § 1964(e). There is no room in the statutory language for an additional, amorphous “racketeering injury” requirement.
Id. at 495, 105 S.Ct. at 3284.
Justice White based this less restrictive reading of the statute on prior case law and the general principles surrounding the statute: “RICO is to be read broadly. This is the lesson not only of Congress’ self-consciously expansive language and overall approach, but also of its express admonition that RICO is to ‘be liberally construed to effectuate its remedial purposes.’” Id. at 497-98, 105 S.Ct. at 3285-86 (citations omitted).
The Court recognized that this interpretation of the statute would permit its use not only against mobsters and organized criminals but also against “respected and legitimate ‘enterprises.’ ” Id. at 499, 105 S.Ct. at 3286. Nevertheless, the Court found that Congress “wanted to reach both ‘legitimate’ and ‘illegitimate’ enterprises.” “The former enjoy neither an inherent incapacity for criminal activity nor immunity from its consequences.” Id. (citation omitted). The Court concluded:
It is true that private civil actions under the statute are being brought almost solely against such defendants, rather than against the archetypal, intimidating mobster. Yet this defect — if defect it is — is inherent in the statute as written, and its correction must lie with Congress. It is not for the judiciary to eliminate the private action in situations where Congress has provided it simply because plaintiffs are not taking advantage of it in its more difficult applications.
Id. at 499-500, 105 S.Ct. at 3286-87 (footnote omitted).
Justice White then suggested that Congress and the courts develop a meaningful concept of “pattern” in order to narrow the scope of civil RICO:
The “extraordinary” uses to which civil RICO has been put appear to be primarily the result of the breadth of the predicate offenses, in particular the inclusion of wire, mail, and securities fraud, and the failure of Congress and the courts to develop a meaningful concept of “pattern.”
Id. at 500, 105 S.Ct. at 3287.
Despite this invitation from the Court, Congress to date has not chosen to enact legislation which would narrow the scope of civil RICO or to define more exactly what is “pattern.” Moreover, the efforts of the courts to do so have not been entirely successful. Our attempts to design a meaningful concept of pattern have continued to *1292 collide with the broad language of the statute.' In response, however, to Sedima, the various circuits began to structure guidelines for determining whether a RICO pattern had been established. In the Third Circuit, for instance, in Barticheck v. Fidelity Union Bank/First Nat’l State, 832 F.2d 36 (3d Cir.1987), we rejected the district court’s requirement in that case that there be two or more unlawful schemes, and we then set forth six factors to be used in determining whether a pattern of racketeering activity has been established in a given case. These factors are: (1) the number of unlawful acts; (2) the length of time over which the acts were committed; (3) the similarity of the acts; (4) the number of victims; (5) the number of perpetrators; and (6) the character of the unlawful activity. Id. at 39.
Other circuits established other criteria. In the Eighth Circuit, the test for a pattern of racketeering activity was much more restrictive: proof of multiple illegal schemes was required. See, e.g., Superior Oil Co. v. Fulmer, 785 F.2d 252 (8th Cir.1986). Following this precedent, the Eighth Circuit Court of Appeals affirmed the district’s court’s dismissal of petitioners’ complaint in H.J. Inc. v. Northwestern Bell Tel. Co., 829 F.2d 648 (8th Cir.1987). The Supreme Court granted certiorari to resolve the conflict between the circuits over whether single or multiple schemes were required to demonstrate a RICO pattern.
In its opinion in H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), the Court set out its second analysis of the requirements of civil RICO. First, as to single versus multiple schemes, the Court noted that the word “scheme” is not found in the RICO statute and indeed that what constitutes a “scheme” is to be found “in the eye of the beholder, since whether a scheme exists depends on the level of generality at which criminal activity is viewed.” 492 U.S. at 241 and n. 3, 109 S.Ct. at 2901 and n. 3. The Court then examined the statute and its legislative history in an attempt to determine the elements of the pattern requirement. From this review, the Court concluded that “to prove a pattern of racketeering activity a plaintiff must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity.” Id. at 239, 109 S.Ct. at 2900.
Under the first, or “relatedness,” requirement of the RICO statute, as interpreted in H.J. Inc., predicate acts are related if they “have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.” Id. at 240, 109 S.Ct. at 2901 (quoting the partially repealed Title X of the Organized Crime Control Act of 1970, 18 U.S.C. § 3575, et seq.).[16]
As for the second, or “continuity,” prong of the analysis, the Court in H.J. Inc. attempted to promulgate a somewhat flexible approach, based upon a “commonsense, everyday understanding of RICO’s language and Congress’ gloss on it.” Id. at 241, 109 S.Ct. at 2902. With this analytical approach in mind, the Court decided that “[w]hat a plaintiff or prosecutor must prove is continuity of racketeering activity, or its threat, simplici-ter.” Id.
In explicating how a plaintiff could make this continuity showing, the Court described continuity as “both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition.” Id. “It is, in either ease, centrally a temporal concept,” id. at 241-42, 109 S.Ct. at 2902, so that a party may establish continuity as a closed-ended concept by “proving a series of related predicates extending over a substantial period of time.” Id. at 242, 109 S.Ct. at 2902 (emphasis added).
Thus, H.J. Inc. makes clear that the continuity requirement can be met by establishing long-term criminal conduct but does not define what length of time qualifies as “substantial” for this purpose. The Court in H.J. Inc. also gave examples of how the threat of continued racketeering activity might be demonstrated. One example is that of a hoodlum who sells “insurance” to storekeep *1293 ers to prevent the breaking of their shop windows. Id. Another example is that of an ongoing entity which commits the predicate acts or offenses as its regular way of doing business. Id. In giving this last example, the Court noted that such a business may be either a criminal or a legitimate enterprise and concluded:
The continuity requirement is likewise satisfied where it is shown that the predicates are a regular way of conducting defendant’s ongoing legitimate business (in the sense that it is not a business that exists for criminal purposes), or of conducting or participating in an ongoing and legitimate RICO “enterprise.”
Id. at 243, 109 S.Ct. at 2902 (footnote omitted). The clear implication of this language is that the ambit of RICO may encompass a “legitimate” businessman who regularly conducts his business through illegitimate means, that is, who repeatedly defrauds those with whom he deals and in the process commits predicate acts, for instance by using the postal service as a means of accomplishing his scheme.
The Court went on in H.J. Inc., at the urging of various amici, to consider, and to reject, a requirement that “a defendant’s racketeering activities form a pattern only if they are characteristic either of organized crime in the traditional sense, or of an organized-crime-type perpetrator, that is, of an association dedicated to the repeated commission of criminal offenses.” Id. at 243-44, 109 S.Ct. at 2903. The Court found that there was no textual support in the statute for such a requirement and that the statutory language did not support the limitation that racketeering acts be the work of an association or group rather than of an individual. Id. at 244, 109 S.Ct. at 2903.
These determinations in H.J. Inc., that the predicate acts may be the regular way in which a legitimate business operates and that the racketeering activities may form a pattern even though they are the acts of an individual rather than of a group or of an association, enforce the Court’s holding in Sedima that RICO reaches both “legitimate” and “illegitimate” enterprises. The Court in H.J. Inc. also rejected the employment of a definitional device, such as “scheme,” to delineate racketeering activity, when the device employed, like “scheme,” may be manipulated to satisfy the necessary criterion. See id. at 241 and n. 3, 109 S.Ct. at 2901 and n. 3.
Whatever view we may have of Congress’s original intent in enacting the RICO statute, we feel constrained, in applying the statute today, to follow the directives given by the Court in Sedima and H.J. Inc.
Since H.J. Inc., this court has faced the question of continued racketeering activity in several cases, each time finding that conduct lasting no more than twelve months did not meet the standard for closed-ended continuity. See Hughes v. Consol-Pennsylvania Coal Co., 945 F.2d 594, 610-11 (3d Cir.1991) (fraudulent conduct lasting twelve months does not establish closed-ended continuity); Hindes v. Castle, 937 F.2d 868, 875 (3d Cir.1991) (eight month period of predicate acts without a threat of future criminal conduct does not satisfy continuity requirement); Kehr Packages v. Fidelcor, Inc., 926 F.2d 1406, 1413 (3d Cir.1991) (same); Banks v. Wolk, 918 F.2d 418, 422-23 (3d Cir.1990) (same); Marshall-Silver Constr. Co. v. Mendel, 894 F.2d 593 (3d Cir.1990) (seven month single-victim, single-injury scheme does not satisfy continuity requirement).[17] In Hughes, we distinguished eases in other circuits in which closed-ended continuity had been established, noting that those cases involved conduct lasting “years, sometimes over a decade.” Hughes, 945 F.2d at 611.
*1294 A.
In evaluating the present case in accord with this precedent, we will first consider whether closed-ended continuity has been established. At the outset, we note that in civil RICO complaints based on predicate acts of mail fraud
the continuity test requires us to look beyond the mailings and examine the underlying scheme or artifice. Although the mailing is the actual criminal act, the instances of deceit constituting the underlying fraudulent scheme are more relevant to the continuity analysis.
Kehr Packages, 926 F.2d at 1414.[18] Consequently, in determining whether or not continuity has been established in the present case, we must focus on the duration of the underlying scheme. Just as the mailings are an element of the federal offense of mail fraud, so too is the scheme or artifice to defraud. See 18 U.S.C. § 1341, set out in footnote 15 supra. Each time defendants misrepresented the business nature of an expense, made a questionable charge, or received compensation to which they were not entitled, they lessened the income available to the Estate. Plaintiffs have provided evidence that these activities, which implemented defendants’ purported scheme to defraud the Estate, lasted more than three and a half years, from November 10,1987, to July 1991. We conclude that a scheme lasting over three years extends over a “substantial” period of time and therefore constitutés the type of “long-term criminal conduct” that RICO was enacted to address. See United States v. Pelullo, 964 F.2d 193, 209 (3d Cir.1992) (holding that a jury could find a nineteen month period of racketeering activity sufficient to satisfy continuity requirement); Swistock v. Jones, 884 F.2d 755, 759 (3d Cir.1989) (fourteen month period of conduct may be sufficient, to establish closed-ended continuity). Accordingly, we find, from the strictly dura-tional aspect of the scheme, that plaintiffs in the present case have made a sufficient *1295 showing to survive summary judgment on the “continuity” prong of the pattern analysis.
The Supreme Court cautions us, however, in H.J. Inc., that the existence of continuity may not always be apparent. 492 U.S. at 243, 109 S.Ct. at 2902-03. For example, the statutory definition of pattern is “at least two acts of racketeering activity” within a ten year period. 18 U.S.C. § 1961(5). It is clear that ten years is a period of long duration. Yet, would two related predicate acts, one committed in February 1982 and one committed in January 1992, be sufficient to form a pattern? It would seem unlikely. Indeed, Justice White noted in a footnote that, while § 1961(5) defines a pattern of racketeering activity as requiring at least two acts of racketeering activity, two acts may not be sufficient. Id. 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14.
The question remains, then, what more is required in order to evaluate whether continuity has been established when predicate acts have occurred over a period of several years. One helpful consideration can be found in the Court’s requirements for open-ended continuity. In H.J. Inc. the Court states that open-ended continuity is established when the commission of the predicate acts is “a regular way of conducting defendant’s ongoing legitimate business.” 492 U.S. at 243, 109 S.Ct. at 2902. It would seem a valid analogy that, if the predicate acts have been a regular way of conducting defendant’s legitimate business over a long period in the past, the RICO pattern has been satisfied.[19] In such a case, the relatedness and the frequency of the predicate acts would have created the pattern of racketeering activity. From our review of the record in the present case, we find that the allegations made by plaintiffs concerning defendants’ manner of doing business over this period satisfy such a RICO continuity requirement.[20]
B.
Moreover, even if we were not to have found that conduct lasting three and one-half years was sufficient to establish closed-ended continuity, we conclude that continuity still would have been established for the purposes of summary judgment in the present ease under an “open-ended” continuity analysis. Under H.J. Inc., if a RICO action is brought before a plaintiff can establish long-term criminal conduct, the “continuity” prong may still be met if a plaintiff can prove a threat of continued racketeering activity. Whether the predicate acts constitute a threat of continued racketeering activity depends on “the specific facts of each case,” id. at 242, 109 S.Ct. at 2902, but H.J. Inc. suggests that open-ended continuity may be satisfied “where it is shown that the predicates are a regular way of conducting defendant’s ongoing legitimate business ... or of conducting or participating in an ongoing and legitimate RICO ‘enterprise.’ ” Id. at 243, 109 S.Ct. at 2902.
Mindful that Kehr Packages instructs us, in determining continuity, to focus on the mail fraud element of the underlying fraudu *1296 lent activity as well as on the element of the mailings, we are persuaded that the evidence here meets the standard for open-ended continuity. Plaintiffs have presented evidence that defendants continuously took questionable expenses, which directly affected the partnership income available to the Estate. Both Price Waterhouse reports are replete with examples of expense charges taken by defendants for which there is not adequate documentation or explanation to substantiate an ordinary and necessary business purpose. These included trips, meals, home services, cars, gasoline, insurance expenditures, and telephone bills.
At this stage of the litigation, we must view the facts in the light most favorable to plaintiffs, the non-movants, i.e., that as a regular way of doing business, defendants were fraudulently misrepresenting expenditures to benefit themselves and to deprive the Estate and its beneficiaries of their legitimate share of the profits of Tabas Enterprises. The evidence in the record is clear that these practices, defendants’ regular way of doing business, continued even after plaintiffs’ complaint was filed. As a consequence, plaintiffs have established a threat of continuing fraudulent conduct as required under an “open-ended” continuity analysis.
C.
Because we have found a pattern of racketeering activity in both the duration of and the on-going threat implicit in defendants’ regular way of doing business, we will not go on to analyze this case under the six Barti-check factors. The fact that we do not employ the Barticheck factors in our analysis here does not, however, mean that they might not be relevant in a different case in determining if continuity exists. As the Court noted in H.J. Inc., in those cases where relatedness and continuity are in doubt, other factors should be examined to discern if there is a “pattern of racketeering activity” under RICO:
The limits of the relationship and continuity concepts that combine to define a RICO pattern, and the precise methods by which relatedness and continuity or its threat may be proved, cannot be fixed in advance with such clarity that it will always be apparent whether in a particular case a “pattern of racketeering activity” exists.
492 U.S. at 243, 109 S.Ct. at 2902-03. It is helpful, therefore, when determining whether “relatedness” or “continuity” has been proven, to use a fact-oriented, case-by-ease approach to determine whether there is a “pattern of racketeering activity.”[21]
In the present case, we find that plaintiffs have clearly presented evidence that is legally sufficient to survive summary judgment on the issue of continuity through the defendants’ alleged commission of the predicate acts and of the underlying fraudulent activity as an ongoing way of doing business. Accordingly, we do not need to concern ourselves with the applicability of the Barticheck factors to the specific facts of this case.
D.
We recognize that our ruling means that RICO, with its severe penalties, may be applicable to many “garden-variety” fraud cases, see Marshall-Silver, 894 F.2d at 597, *1297 particularly considering the judiciary’s broad interpretation of the mail fraud statute. See Kehr Packages, 926 F.2d at 1413-14. We are bound, however, by the language of RICO itself and the Supreme Court’s instruction that “RICO is to be read broadly.” Sedima, 473 U.S. at 497, 105 S.Ct. at 3285. Indeed, the Supreme Court has consistently struck down efforts by the courts of appeals to narrow RICO’s scope. See NOW v. Scheidler, — U.S.-, -, 114 S.Ct. 798, 806, 127 L.Ed.2d 99 (1994) (rejecting Seventh Circuit holding that RICO requires proof that either the racketeering enterprise or the predicate acts of racketeering were motivated by an economic purpose); H.J. Inc., 492 U.S. at 250, 109 S.Ct. at 2906 (rejecting Eighth Circuit holding that RICO requires proof of multiple “schemes”); Sedima, 473 U.S. at 495, 105 S.Ct. at 3284 (rejecting Second Circuit holding that RICO requires proof of prior conviction on predicate act and that plaintiff must demonstrate specific “racketeering injury”).
We share the Supreme Court’s concern over the broad application of the civil RICO statute. We are nonetheless bound by the language of the statute and the Supreme Court’s interpretation of it. Accordingly, it is for Congress to decide whether to narrow the scope of RICO; we are not in a position to do so by requiring that parties prove elements of a threat or of an injury, presented by predicate racketeering activity, beyond what is expressed in the language of the statute itself.[22]
Y.
Defendants have raised a number of alternative grounds for summary judgment claiming that insufficient causation and injury have been pleaded and that some of the defendants are not potentially liable under RICO. Because discovery has not been completed, we find that it would be premature to address these alternative grounds. Plaintiffs have sought to take additional depositions that could have substantial bearing upon these issues. Additionally, the district court did not rule on any of the alternative grounds, and, as a consequence, it would be inappropriate for us to consider them at this stage.[23]
VI.
For the foregoing reasons, we will reverse the district court’s decision granting summary judgment against plaintiffs on their RICO claims, we will vacate the dismissal of plaintiffs’ supplemental state claim, and we will remand this case to the district court for further proceedings consistent with this opinion.[24]

. There are six heirs to the Estate, including the Charles L. Tabas Foundation.

. Prior to Charles's death, each brother received a monthly disbursement of $10,000 from Tabas Enterprises. In addition, the brothers appeared to have an arrangement under which Tabas Enterprises paid for many personal and business expenses.

. The parties dispute whether plaintiffs were aware that Daniel was receiving substantial compensation from Tabas Enterprises in addition to his monthly draw check. Defendants argue that, soon after Charles’s death, plaintiffs knew of Daniel's compensation and therefore could not have been deceived by the monthly checks which served as the basis of the mail fraud predicate acts. Plaintiffs acknowledge that they believed Daniel was taking more than he was entitled to under the partnership agreement; this was partly the basis for the 1986 state suit. They contend, however, that they did not know the extent to which they were being short-changed until Price Waterhouse was given access to Tabas Enterprises' records. Consequently, plaintiffs assert that they initiated this suit as soon as they discovered the extent of the alleged fraudulent activity.

. The settlement agreement also provided that Daniel would purchase the Estate’s interest in Acorn Iron and Supply Company and $1.5 million in Royal Bank stock. In addition, the Estate's interest in property on City Line Avenue was transferred to Daniel, apparently in exchange for monies from Tabas Enterprises. Defendants, pointing to the $16.9 million that the Estate has received pursuant to the settlement agreement and liquidation of Tabas Enterprises, assert that plaintiffs have been treated equally. While plaintiffs do not appear to dispute the amount the Estate has received, they do assert that it has not received an equal one-half of the income as required under the partnership agreement.

. At that time, Judge Yohn sat on the Pennsylvania Court of Common Pleas. He is now a United States District Judge for the Eastern District of Pennsylvania.

. These rulings were premised upon Judge Yohn's finding that: "By agreement of the parties and with the concurrence of the arbitrator, the arbitrator has jurisdiction to rule upon the issue of whether the Estate may make claims against Daniel M. Tabas concerning his management of Tabas Enterprises subsequent to November 20, 1987.” App. at 1185.

. On May 29, 1991, the district court entered a scheduling order. This schedule provided, inter alia, that discovery be completed by December 2, 1991. The schedule also provided that defendants' motion for summary judgment had to be filed on or before October 21, 1991, and that plaintiffs’ response was due by November 4, 1991. Because this schedule required plaintiffs to respond prior to the completion of discovery, and because the parties had further disagreements about discovery, the factual record is not fully developed. Nonetheless, the record is sufficient to support our conclusion that the requisites for RICO continuity have been met.

.Price Waterhouse noted that its formal “opinion” was subject to scope limitations as discussed within each report. Our review of these limitations indicates that most were caused by Tabas Enterprises’ failure to cooperate with the Price Waterhouse auditors. In addition, Price Waterhouse described Tabas Enterprises’ major records depository as in a "state of disarray.” In considering these reports, we will weigh the effect of the scope limitations in light of our conclusion that most limitations to the analysis were *1285 a result of Tabas Enterprises' efforts to hinder the Price Waterhouse audits.

. The report found these gasoline charges, in excess of $18,000, especially problematic, since the relevant documents revealed routine submissions of multiple requests for reimbursement arising from a single receipt.

. In his deposition, Daniel testified that all un-reimbursed expenses represented legitimate business expenses. For most of these expenses, however, Daniel could not provide any specific recollection of the business purpose involved.

.Price Waterhouse also noted that, in addition to his Tabas Enterprises income, Daniel received compensation as Chairman of the Board of Royal Bank. At his deposition, Daniel testified that he worked 60-70 hours per week for Tabas Enterprises, app. at 1683, and that his Royal Bank time commitment consisted of Thursday morning executive staff meetings and a board meeting one evening each month. App. at 614.

. Count II of the amended complaint alleges that defendants violated § 1962(d) by conspiring to violate subsections (a), (b), and (c).
Counts III-VI of the amended complaint allege state law claims that are not central to this appeal, including breach of fiduciary duty, breach of contract, fraud, and conversion. The district court dismissed these state law claims without prejudice. Because we find that the district court erred in dismissing Counts I and II, we will instruct the district court to vacate the dismissal of plaintiffs' supplemental state law claims.

. Plaintiffs also allege as predicate acts defendants' use of the United States mails to send checks to Daniel's children and son-in-law for work not performed. We do not rely on these allegations, however, because plaintiffs have not produced any evidence to counter McSwiggan's deposition testimony that these checks were delivered by courier. See, e.g., Utz v. Correa, 631 F.Supp. 592, 596 (S.D.N.Y., 1986) (delivery of letter by messenger did not violate the mail fraud statute since the United States mails were not used).

. The district court's first order, dated May 26, 1993, granted defendants’ motion for summaiy judgment on Counts I and II, and dismissed Counts III, IV, and V pursuant to 28 U.S.C. § 1367(c)(3). The district court's second order, dated June 2, 1993, amended the first order to include dismissal of Count VI pursuant to § 1367(c)(3).

. Mail fraud, 18 U.S.C. § 1341, is the racketeering activity involved in the case before us. Section 1341 provides in pertinent part:
Whoever, having devised ... any scheme or artifice to defraud, or for obtaining money or properly by means of false or fraudulent pretenses, representations, or promises, ... for the purpose of executing such scheme or artifice ... places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, ... shall be fined not more than $1,000 or imprisoned not more than five years, or both.
The federal offense of mail fraud was originally enacted by Congress in 1872 as a part of the recodification of the postal laws. The Supreme Court in its first review of the mail fraud statute made clear that its scope was broad. The Court held that the statute reached beyond the common law definition of "false pretences” to encompass "everything designed to defraud by representations as to the past or present, or suggestions and promises as to the future.” Durland v. United States, 161 U.S. 306, 313, 16 S.Ct. 508, 511, 40 L.Ed. 709 (1896). Fraud, involving the use of the postal system to cany it out, was made a federal offense by Congress with the "purpose of protecting the public against all such intentional efforts to despoil, and to prevent the post office from being used to cany them into effect....” Id. at 314, 16 S.Ct. at 511.
Judge Greenberg, in his dissent, queries whether Congress intended RICO to be applied to a defendant, participating in a scheme to defraud, who mails substantial payments but not to a similar defendant who delivers the payments by hand. See [at 1307-08]. The clear answer to this question is "yes" because, first, the former example constitutes mail fraud and the latter does not and, second, Congress has chosen to include mail fraud as a RICO predicate act.

. The parties do not dispute that the relatedness prong has been met in the present case.

. In Marshall-Silver, we considered whether Congress intended RICO to apply in the situation of an extended scheme which posed no "significant societal threat” beyond its extended duration. 894 F.2d at 597. Because the scheme there lasted only seven months and posed no threat of recurrence, we stated that we would not resolve the "societal threat” issue. In view, however, of the Court’s refusal in Sedima and HJ. Inc. to require racketeering injury, or prior conviction of the predicate acts, or multiple schemes, or racketeering acts by an association or group rather than by an individual, we cannot conclude that, in order to satisfy the RICO continuity requirement, the Court would require the existence of a "societal threat,” whatever exactly that may be, beyond the commission of the criminal predicate acts. To the extent that Marshall-Silver can be read to hold otherwise, it is overruled.

. Defendants' assertion that the mailings involved must themselves be relied upon by the victim of the fraud in order for a RICO claim to be established is inaccurate. As this Court stated in Kehr Packages, "completely 'innocent' mailings can satisfy the mailing element." 926 F.2d at 1415 (citing Schmuck v. United States, 489 U.S. 705, 715, 109 S.Ct. 1443, 1450, 103 L.Ed.2d 734 (1989)). Indeed, mailings “designed to lull [fraud] victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place" have been found to constitute actionable mail fraud. Kehr Packages, 926 F.2d at 1416 n. 3 (quoting United States v. Lebovitz, 669 F.2d 894, 896 (3d Cir.), cert. denied, 456 U.S. 929, 102 S.Ct. 1979, 72 L.Ed.2d 446 (1982)).
Additionally, the use of the mails need not be an essential element of the fraudulent scheme. Rather, so long as the mailings are "incident to an essential part of the scheme,” Pereira v. United States, 347 U.S. 1, 8, 74 S.Ct. 358, 363, 98 L.Ed. 435 (1954), the mailing element is satisfied. This principle is elucidated by a review of the facts in Schmuck v. United States, 489 U.S. 705, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989). In that case, Wayne Schmuck was engaged in a fraudulent scheme in which he would purchase used cars, roll back their odometers, and sell the cars to retailers for a price higher than their actual worth. After purchasing an automobile from Schmuck and selling it to a customer, the dealers, in order to complete the resale of each automobile, would submit a title application form to the Wisconsin Department of Transportation. The mailing of these forms constituted the mailing element of Schmuck's indictment on 12 counts of mail fraud. The Supreme Court found that those mailing were sufficient to sustain Schmuck's indictment on mail fraud charges, reasoning that
Schmuck’s scheme would have come to an abrupt halt if the dealers either had lost faith in Schmuck or had not been able to resell the cars obtained from him. These resales and Schmuck's relationship with the retail dealers naturally depended on the successful passage of title among the various parties. Thus, although the registration-form mailings may not have contributed directly to the duping of either the retail dealers or the customers, they were necessary to the passage of title, which in turn was essential to the perpetuation of Schmuck's scheme.
Id. at 712, 109 S.Ct. at 1448.
In the instant case, it is clear that the mailings were incident to an essential part of the scheme. Had the defendants failed to mail disbursement checks to plaintiffs, plaintiffs would have immediately been alerted to defendants' alleged scheme. Consequently, by virtue of the disbursements mailed to plaintiffs, defendants were allegedly able to delay discovery of their scheme to misappropriate an excessive share of the partnership's profits. The scheme could not have continued unless the checks were delivered by one means or another. As long as the method of delivery was through the United States Postal Service, defendants’ alleged scheme satisfied the elements of the federal offense of mail fraud.

. In making this analogy, we in no way imply that the predicate acts must constitute a "regular way” of a defendant’s doing business. We merely give one example of the manner in which “pattern” may be demonstrated.

. The district court, in granting summary judgment to defendants, found that "[tjhis is not a case where the predicate acts are ‘part of an entity's regular way of doing business,' such as would affect others doing business with the entity.” App. at 1377. (citing H.J. Inc., 492 U.S. at 242, 109 S.Ct. at 2902). See supra at page 1289.
To the extent that the district court suggests that effects upon others doing business with the entity are relevant to a finding of "continuity,” we are not certain if the district court is requiring that those affected be outsiders doing business with the entity, as opposed to investors or partners in or beneficiaries of the entity. If so, we find no support in H.J. Inc. for such a requirement. The implication of the cited passage in H.J. Inc. does not limit its holding to require that the effect be on those who are doing business with the entity.
If, on the other hand, the district court was making a finding of fact on the scope of the defendants’ regular way of doing business, i.e., that the alleged scheme to defraud the Estate and its beneficiaries, through the repeated actions described by Price Waterhouse, did not constitute defendants' regular way of doing business, then in view of the facts of record, we must conclude that such a finding of fact is clearly erroneous.

. Although we decided Barticheck before H.J. Inc., we have since noted that the six Barticheck factors are still relevant in determining whether a pattern exists. See Hindes v. Castle, 937 F.2d 868, 873 n. 3 (3d Cir.1991) ("[T]he Barticheck factors, such as the number of acts, victims, and perpetrators and the character of the unlawful activity, may be relevant in some cases in assessing the threat of continuing criminal conduct by throwing light on whether the illegal activity was part of a legitimate business’ regular way of conducting business, or whether the predicates were attributable to a long-term association that exists for criminal purposes.' ”) (citation omitted).
It remains clear, however, that “duration is the sine qua non of continuity.” Hindes, 937 F.2d at 873. For this reason, the Barticheck factors are best viewed as analytical tools available to courts when the issue of continuity cannot be clearly determined under either a closed- or open-ended analysis. It should also be noted that the H.J. Inc. decision cites the Third Circuit’s holding in Barticheck for two narrow propositions only: (1) that continuity is both a closed- and open-ended concept, 492 U.S. at 238, 109 S.Ct. at 2900, and (2) that "scheme” is not a self-defining term, 492 U.S. at 241 n. 3, 109 S.Ct. at 2901 n. 3. Nowhere in H.J. Inc. does the Supreme Court expressly adopt the Barticheck factors as being required elements in the "continuity” analysis.

.The dissent relies upon our recent holding in Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250 (3d Cir.1994) for the proposition that civil RICO should not be applicable in cases lacking a significant societal threat. But see footnote 17 in regard to our position that there is no requirement in civil RICO that the predicate acts pose a "societal threat.” We find several significant differences, however, between Jordan and the dispute here. First, the duration and continuing nature of the underlying fraudulent activity alleged here is much greater. In addition, the district court in Jordan questioned the "relatedness” of the predicate acts, see Jordan v. Berman, 792 F.Supp. 380, 385-86 (E.D.Pa.1992), and further held that plaintiffs had failed to establish that they had sustained any injury from the purported predicate acts. Id. at 388. Finally, and perhaps most importantly, the district court in Jordan found that there was no evidence presented that would lead a jury to believe that mail fraud had been committed. Id. at 387. As discussed above, we have come to a different conclusion in the present dispute.

. We note that on remand the court should consider whether the decision in Reves v. Ernst & Young, — U.S. -, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993) has any bearing on this case. In Reves, the Supreme Court held that only defendants who participate in the operation or management of an enterprise can be held liable for violating 18 U.S.C. § 1962(c).

. In view of our vacatur of the dismissal of plaintiffs' supplemental state claims, we do not need to rule on defendants' cross-appeal.